UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

----oo0oo----

| | |
|---|---|
| CHAD WAHL,<br><br>   Plaintiff,<br><br> v.<br><br>CCA and DR. DAVID AGLER,<br><br>   Defendants. | CIV. NO. 1:13-376 WBS<br><br>MEMORANDUM AND ORDER RE: MOTIONS TO STRIKE AND FOR SUMMARY JUDGMENT |

----oo0oo----

   Plaintiff, a state prisoner, brought this civil rights action under 42 U.S.C. § 1983 against defendants Corrections Corporation of America ("CCA") and Dr. Agler, alleging Eighth Amendment violations. Presently before the court are defendants' motions to strike and for summary judgment.

I. Factual and Procedural Background

   Plaintiff is an inmate at Idaho Correctional Center ("ICC") in Kuna, Idaho. (Compl. ¶ 1.) Defendant CCA is a for-profit corporation, (id. ¶ 2), which was under contract to

1

provide medical care to ICC inmates until July 2014, (Agler Decl. ¶ 2). Defendant Dr. Agler treated plaintiff while acting as ICC's medical director and lead physician during the period relevant to this action. (Id.)

On August 31, 2011, plaintiff was attacked in his jail cell, and in his defense, he struck the attacker with his fists. (Wahl Decl. ¶ 4 (Docket No. 20).) The next day, plaintiff had an X-ray of his hands to diagnose problems resulting from the fight. (Agler Decl. ¶ 9 (Docket No. 14).) On September 2, 2011, Dr. Agler saw plaintiff and noted plaintiff had pain, difficulty flexing, and "trauma, possible tendon issue vs. strain" in his right third finger. (Agler Decl. Ex. A at 47 (Docket No. 14-4).) According to Dr. Agler, the September 1 X-ray showed no fractures in plaintiff's right hand. (Agler Decl. ¶ 12.) He prescribed plaintiff a high dose of ibuprofen and ordered that plaintiff's right finger be placed in a splint for six weeks. (Agler Decl. ¶ 10, Ex. A at 47.) Dr. Agler also ordered a follow-up X-ray in two weeks to ensure there were not fractures present. (Agler Decl. ¶ 10, Ex. A at 47.)

The follow-up X-ray occurred approximately one month later on September 30, 2011. (Agler Decl. Ex. A. at 17.) The accompanying report noted that shrapnel was embedded in both of plaintiff's hands, and stated, "There is fairly severe degenerative disease involving the third MP joint." (Id.) At the bottom of the report is a note saying "10/7/11, Healed fx" stamped David Agler, M.D. (Id.) Dr. Agler states that based on the two sets of X-rays, and the absence of any fractures, he decided no further treatment was necessary. (Agler Decl. ¶ 12.)

Plaintiff, however, continued to experience severe pain in his right hand, especially in his middle finger. (Wahl Decl. ¶ 6.) By October 20, 2011, plaintiff's splint had not yet been removed. (Wahl Decl. ¶ 10.) He submitted a concern form to Dr. Agler complaining of swelling and pain in his right hand but received no response. (Id.) Plaintiff removed the splint on his own. (Id.)

Although Dr. Agler saw plaintiff on September 2, 2011, (see Agler Decl. Ex. A at 47), Dr. Agler did not order a visit to an outside orthopedist until January 26, 2012, (Agler Decl. ¶ 16). At the January 26, 2012 appointment, plaintiff's hand was still in extreme pain. (Wahl Decl. ¶ 12.) Dr. Agler noted that plaintiff was unable to flex his third finger, and there was "minimal pain unless he forces the flexing." (Agler Ex. A at 46.) Plaintiff clarifies that he told the doctor "that the moving of the finger did not produce any additional pain unless it was flexed beyond a certain point." (Wahl Decl. ¶ 12.) Based on plaintiff's limited range of motion in his right hand, Dr. Agler requested that plaintiff see an orthopedic surgeon for further treatment. (Agler Decl. ¶ 16, Ex. A at 32 (noting "ortho consult").)

Plaintiff did not see outside orthopedist Dr. Watkins until nearly three months later on April 16, 2012. On plaintiff's first visit, Dr. Watkins noted that plaintiff suffered from loss of motion. (Watkins Dep. at 12:13-15 (Docket No. 26-2).) Plaintiff also had fairly significant arthritis in his middle finger that was "long term in nature." (Id. at 16:16-19.) Dr. Watkins recommended that plaintiff do stretching

exercises in an effort to get his motion back and decrease scar formation before contemplating surgery. (Id. at 14:14-17.) Plaintiff made several more visits to Dr. Watkins, at which the doctor continued to recommend exercise.[1] At plaintiff's third appointment with Dr. Watkins on June 22, 2012, Dr. Watkin's nevertheless recommended surgery to increase plaintiff's range of motion. (Agler Decl. ¶ 25, Ex. A at 76-77.)

Plaintiff underwent surgery on August 14, 2012.[2] (Agler Decl. ¶ 26.) In the course of surgery, Dr. Watkins discovered a hole in plaintiff's tendon. (Watkins Dep. at 20:20-21.) Dr. Watkins states that "[a]t surgery, plaintiff had a fracture fragment at the base of the middle phalanx that I really didn't appreciate on his X-rays, even when I went back and looked at them." (Id. at 19:12-15.) Dr. Watkins removed a small piece of bone to free up the tendon as much as he could. (Id. at 20:20-23.) However, because of the tendon injury, Dr. Watkins had to splint plaintiff's finger. (Id. at 21:9-10.)

Plaintiff's post-surgical care after the first operation was initially regular. Plaintiff saw Dr. Agler for post-surgical follow-up appointments on August 22, September 5,

---

[1] Plaintiff saw Dr. Watkins again on May 16, 2012, at which point Dr. Watkins recommended another follow-up in four weeks, (Agler Decl. ¶ 22, Ex. A at 45, 84), and Dr. Agler ordered another follow-up. Plaintiff saw Dr. Watkins again on June 22, 2012, approximately five weeks later. (Agler Decl. ¶ 25.)

[2] Dr. Agler states he did not receive the report from the June 22 Watkins visit until July 25, 2012. (Agler Decl. ¶ 25, Ex. A at 43 (noting on July 25, 2012, "Reviewed ortho note recommending surgery. Ordered. Apparently this was the recommendation based on 6/22/12 appt. but note received today").) That same day, Dr. Watkins ordered the surgical procedure recommended by Dr. Watkins. (Agler Decl. ¶ 25.)

4

and September 24 2012.  (Id. ¶¶ 26-32.)  At the September 24 appointment, Dr. Watkins noted that despite the first surgery, plaintiff still had adhesions of the extensor tendon, and he hoped to do an additional surgery when the time comes, "if indicated."  (Tribble Decl. Ex. F (Docket No. 21-6).)  Dr. Watkins further noted he would see plaintiff in four weeks.  (Id.)

A follow-up appointment did not occur within the prescribed four-week window.  On November 15, 2012, plaintiff had still not seen Dr. Watkins again, and he filed a grievance stating that Dr. Watkins had discussed a second surgery with him, and his hand was still in a lot of pain, and "I am not asking for a date. I am just asking if [the second surgery] is going to happen."  (Wahl Decl. Ex. A at 270.)  As of December 18, 2012, Dr. Agler noted that although the notes from the September 24, 2014 visit with Dr. Watkins were still "unavailable," a follow-up with Dr. Watkins was scheduled for February 18, 2013.  (Agler Decl. ¶ 35, Ex. A at 38.)  On December 26, 2012, plaintiff filed another grievance inquiring about the second surgery, to which a staff member replied, "Attempting to diagnose and treat you via concern form is inappropriate.  You are scheduled to follow up with ortho relatively soon.  If you would like to be seen, please put in an HSR."  (Id.)

When plaintiff finally returned to Dr. Watkins on February 18, 2013, plaintiff still suffered from poor range of motion, so Dr. Watkins recommended a second surgery.  (Agler Decl. Ex. A at 201.)  Although in Dr. Watkin's view plaintiff's finger would not return to normal, plaintiff had a chance to

5

recover at least half of his normal motion. (Id.) Upon seeing those recommendations the next day, Dr. Agler ordered surgery. (Agler Decl. ¶¶ 39-40.) On February 26, 2013, Dr. Watkins performed an extensor tenolysis of plaintiff's right long finger. (Id.) As a result of this surgery, Dr. Watkins discovered that plaintiff had osteoarthritis in one of his joints, which further complicated treatment, and he believed could have required joint replacement in the future. (Watkin's Dep. at 20:1-5, 13-21.)

What followed is not entirely clear from the evidence submitted by the parties. Plaintiff states after his second surgery, he was supposed to return to Dr. Watkins' office in one month to get his sutures removed. (Wahl Decl. ¶ 14.) According to plaintiff's health services progress notes, as well as Dr. Watkin's notes, plaintiff visited Dr. Watkins for a follow-up appointment on March 4, 2013. (Agler Decl. Ex. A at 157, 203.) The progress notes state plaintiff returned from that visit with right hand sutures "still intact." (Agler Decl. ¶ 41, Ex. A at 157.) On plaintiff's March 18, 2013 visit to Dr. Watkins, Dr. Watkins noted, "I will see [plaintiff] back next week to remove his sutures." (Id. at 203.) Dr. Watkins felt at that point, it was too early to remove plaintiff's sutures because there was still a risk plaintiff could open his incision. (Watkins Dep. at 27:25-26:9.) Dr. Agler supposedly ordered a follow-up appointment with Dr. Watkins for April 3, 2013, (Agler Decl. ¶ 46), but that appointment never occurred. Instead, Dr. Watkins states that his office "got a phone call on April the 2nd canceling [plaintiff's] appointment, being informed that they were going to reschedule, giving no reason for the cancellation,

but did not reschedule." (Watkins Dep. at 26:17-21.) Plaintiff states he was forced to remove the sutures on his own. (Wahl Decl. ¶ 14.)

Dr. Agler states that because of security reasons, Dr. Watkins was unable to see any ICC patients, and plaintiff's post-operative care was directed to Dr. Care. (Agler Decl. ¶¶ 47-48.) Plaintiff met with Dr. Care on May 8, 2013. (Agler Decl. Ex. A at 196.) Dr. Care noted that plaintiff's right finger had gotten infected after the fight, and despite repeated attempts at reconstructing the extensor mechanism, he had poor finger extension and pain. (Id.) Dr. Care discussed plaintiff's options with him, and stated that although further surgery was possible, there were risks, including infection, failure of the operation or need for additional operations, reflex sympathetic dystrophy, and anesthetic risks. (Id. at 197-98.) Dr. Care also discussed amputation. (Id. at 198.)

Understanding from Dr. Care that his alternatives to amputation were risky and not likely to succeed, and after almost two years of extreme pain and delays, plaintiff communicated to Dr. Care that he preferred to go with the amputation option. (Wahl Decl. ¶ 15.) Dr. Agler spoke with plaintiff regarding his options, and plaintiff elected the surgery. (Agler Decl. ¶ 50.) On June 6, 2013, Dr. Care performed a long ray amputation on plaintiff's right hand. (Agler Decl. ¶ 53, Ex. A at 183.)

Plaintiff brought Eighth Amendment claims against Dr. Agler and CCA for harm he suffered as a result of allegedly purposeful delays in treatment of his finger. (See Compl. (Docket No. 1).) Defendants now move for summary judgment

7

pursuant to Federal Rule of Procedure 56. (Docket No. 14.) They also move to strike several exhibits that plaintiff offered in support of his Response to defendants' motion. (Docket No. 23.)

II. Defendants' Motion to Strike

Exhibits A, B, C, G, and H to the Tribble Declaration, offered by plaintiff in support of his opposition to defendants' motion for summary judgment, are documents from another case plaintiff's counsel brought in this district, Caplinger v. CCA, Civ. No. 1:12-537.[3] Defendants move to strike the five exhibits on the basis that plaintiff never identified or produced them during discovery for the instant case.[4] (Defs.' Mot. to Strike at 1 (Docket No. 26).)

---

[3] These five exhibits come from discovery conducted by the Tribble Law Firm in Caplinger. Exhibit A is a deposition Tribble took of Dr. Agler, who was also named as a defendant in the Caplinger case (Docket No. 21-1); Exhibit B is a deposition of Chris Penn, Chief of Security with Correction Corporation of America ("CCA") (Docket No. 21-2); Exhibits C and G are CCA's responses to plaintiff's interrogatories and requests for production (Docket Nos. 21-3, 21-7, 21-8); and Exhibit H is a deposition of Acel Thacker, Health Services Administrator at CCA (Docket No. 21-9).

[4] Defendants also object to portions of plaintiff's declaration on the basis that it contains hearsay. (Defs.' Mot. to Strike at 6.) Paragraphs 15 and 17 reference out-of-court statements made by Dr. Care, an outside treating physician. (See Wahl Decl. ¶ 15 ("Dr. Care made it sound like any of my alternatives to amputation were risky and not likely to succeed."); id. ¶ 17 ("Dr. Care talked me into the surgery . . . .").) Plaintiff does not appear to be offering these statements for the truth of the matter asserted, but rather to show the effect Dr. Care's advice had on plaintiff's decision to agree to amputation. Furthermore, the court is hesitant to entertain hearsay objections on a motion for summary judgment, where defendants have not shown plaintiff would be unable to present them in a form that would be admissible at trial.

8

Rule 26(a) requires that a party disclose copies of all documents in its possession, custody, or control and may use to support its claims or defenses. Fed. R. Civ. P. 26(a)(1)(A)(ii). Counsel for plaintiff concedes he failed to disclose the Caplinger documents to defendants, "due to a clerical error and misunderstanding arising out of conversations between [plaintiff's counsel] Mr. Tribble and Mr. Stoll, an attorney who no longer works at [defendants' firm] Naylor & Hales." (Pl.'s Resp. at 2 (Docket No. 26).)

Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Rule 37(c)(1) 'is intended to put teeth into the mandatory . . . disclosure requirements' of Rule 26(a) and (e)." Ollier v. Sweetwater Union High School Dist., 768 F.3d 843, 861 (9th Cir. 2014).

"Rule 37(c)(1) provides for the 'automatic' and 'self-executing' exclusion of an expert witness if the discovery rules have not been complied with." Morse v. SEG U.S. 95, LLC, at *4 (citing Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001)). The party who fails to disclose has the burden of establishing such a failure was "substantially justified" or "harmless." R&R Sails, Inc. v. Ins. Co. of Pa., 673 F.3d 1240 (9th Cir. 2012).

Plaintiff's counsel argues his failure to disclose the exhibits was substantially justified by a misunderstanding.

9

Naylor & Hales, counsel for defendants, and Tribble Law Firm, counsel for plaintiff, are also representing defendants and plaintiff, respectively, in Caplinger, as well as several other cases. (Tribble Decl. ¶ 4.) Plaintiff's counsel Aaron Tribble states that while working on those other cases, he had several conversations with Naylor & Hales attorney James Stoll, who has since left the firm. (Id. ¶ 5.) Mr. Tribble communicated his desires to use information obtained on each case for the other cases. He states, "It was my understanding that Mr. Stoll understood this, and this understanding was reflected in a stipulated protective order on the Loftis case allowing use of the information for other cases where I would represent other plaintiffs." (Id.) Plaintiff did not provide the court with a copy of the protective order in the Loftis case. Counsel for plaintiff further states that sometime last year, Mr. Stoll left the employ of Naylor & Hales. (Id.) "With this understanding in mind, Mr. Tribble inadvertently erred in not disclosing these materials to the defendant's [sic] attorneys." (Pl.'s Resp. to Mot. to Strike at 2 (Docket No. 26).)

The court finds it difficult to see how Mr. Tribble understood that the implied agreement between Mr. Stoll and him would have relieved plaintiff of his duties to disclose the Caplinger exhibits. Even if the two attorneys agreed "that the materials from each case would be used on the other related cases when needed," there was no blanket agreement that, when a party decided to use a selection of those materials for another case, that party would then have no duty to disclose its selection. Nevertheless, the court finds plaintiff's non-

10

disclosure of the exhibits harmless. At the hearing, defense counsel was unable to explain to the court what it would have done differently during discovery had it been aware that plaintiff planned to rely on the depositions and interrogatories from Caplinger to show a pattern of delay in medical treatment. Defendants argue that had plaintiff properly disclosed the documents, "they would have identified adequate documents and witnesses and specifically addressed Wahl's evidence in their initial motion for summary judgment, instead of having to respond in a reply memorandum without any adequately disclosed documents of their own." (Def.'s Reply in Support of Mot. to Strike at 3 (Docket No. 27).) Had defendants felt they needed more time for their reply based on the untimely disclosure, the court would have granted it. Defendants never made that request. Because the court finds the nondisclosure of exhibits A, B, C, G, and H to be harmless, the court denies defendants' motion to strike those exhibits.

III. Eighth Amendment Claims

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that

negates an essential element of the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting then-Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. Id. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Id.

A. Eighth Amendment Claim Against Dr. Agler

To state a claim under 42 U.S.C. § 1983 based on inadequate medical care under the Eighth Amendment, plaintiff must show Dr. Agler acted with deliberate indifference to

12

plaintiff's serious medical needs."[5] Estelle v. Gamble, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." (internal quotation marks and citation omitted)). "Deliberate indifference is a high legal standard," and it requires more than a showing that prison officials were negligent. Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). Plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." See Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

### 1. Delay

"Indifference 'may appear when prison officials deny, delay or intentionally interfere with medical treatment . . . .'" Jett, 439 F.3d at 1096 (quoting Hutchinson v. United States, 838 F.2d 390, 392 (9th Cir. 1988)). Plaintiff complains, inter alia,

---

[5] The parties do not contest that plaintiff's medical need was serious. See Jett v. Penner, 439 F.3d 1091 (9th Cir. 2006) (holding that to maintain an Eighth Amendment claim, the plaintiff must show a "serious medical need").

Further, although defendant is not a public employee, there is no issue of state action here. "A § 1983 plaintiff must demonstrate . . . that the defendant acted under the color of state law," meaning "'the party charged with the deprivation must be a person who may fairly be said to be a [governmental] actor.'" Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003) (quoting Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 937 (1982)). The Supreme Court has held that private physicians employed by the state to provide medical services to state prison inmates act under the color of state law for purposes of § 1983 when undertaking their duties to treat an inmate's injuries. West v. Atkins, 487 U.S. 42, 54 (1988). Dr. Agler's care of plaintiff falls within the ambit of Atkins. Although Dr. Agler acted as an employee of a private contractor, he acted under the color of state law for the purposes of § 1983 when he treated plaintiff.

13

of a significant delay between his injury and his first visit with an orthopedist.

Although Dr. Agler saw plaintiff on September 2, 2011, (see Agler Decl. Ex. A at 47), he did not order a visit to an outside orthopedist until January 26, 2012, (Agler Decl. ¶ 16). Even after Dr. Agler ordered the appointment on January 26, plaintiff did not actually see Dr. Watkins until on April 16, 2012. (See id. ¶ 20.) Therefore, the initial delay in plaintiff's referral to Dr. Watkins covered the period from September 2, 2011 to April 16, 2012.

Plaintiff offers sufficient evidence that Dr. Agler was aware of plaintiff's need to see an orthopedist from October 7, 2011 onward. Dr. Agler states the September 1 X-ray revealed no fractures, (Agler Decl. ¶ 12), and plaintiff has not provided evidence from which a reasonable jury could infer that at that point Dr. Agler had knowledge that plaintiff's hand required a referral to an orthopedist.[6] However, the follow-up X-ray on September 30 reported that plaintiff suffered from a degenerative disease. (See Agler Decl. Ex. A at 17 ("There is fairly severe degenerative disease involving the third MP joint.")) Although

---

[6] Dr. Watkins also viewed X-rays of plaintiff's finger, and did not see it indicated that plaintiff suffered a fracture. See Naylor Decl. Ex. A at 18:18-21 ("Interestingly, [plaintiff] had a fracture that I didn't really appreciate in his X-ray because it was arthritic, but it was a small loose fracture fragment."); id. at 19:12-15 ("At surgery, plaintiff had a fracture fragment at the base of the middle phalanx that I really didn't appreciate on his X-rays, even when I went back and looked at them.").) Plaintiff offers no other evidence supporting the inference that Dr. Agler had knowledge on September 2 that plaintiff had suffered from a fracture.

14

Dr. Agler appears to have reviewed the report on October 7, 2011, (see id. ("10/7/11/ Healed fx / David Agler.")), he still did not order any further treatment for plaintiff's hand. In addition to the September 30 report, plaintiff filed a grievance on October 20, 2011 stating he was suffering from pain. (Wahl Decl. ¶ 10, Ex. A at 294.) Although Dr. Agler states he never saw the grievance, plaintiff is entitled to the inference in his favor that if the grievance was in his record, the doctor was aware of it. See Jett, 439 F.3d at 1091, 1097 (holding that, as the party opposing the defendant's motion for summary judgment, plaintiff was entitled to the inference that the doctor was aware of filed grievances, medical slips, and aftercare instructions in plaintiff's medical record).

        Despite Dr. Agler's awareness of plaintiff's pain and the report of degenerative disease in plaintiff's middle finger, Dr. Agler provided no immediate further treatment for plaintiff's hand. (See Agler Decl. ¶ 3.) Plaintiff states Dr. Agler never even followed up with plaintiff to remove the splint from plaintiff's finger, and plaintiff had to remove it on his own. (Wahl Decl. ¶ 10.) From this evidence, a reasonable jury could infer purposeful delay, having concluded that Dr. Agler became aware that plaintiff had a degenerative disease in his middle finger when he reviewed the X-ray report on October 7, 2011 and yet failed to respond to the continued swelling and pain plaintiff experienced. See Tyler v. Smith, 458 Fed. Appx. 597 (9th Cir. 2011) (holding that plaintiff stated a claim for deliberate indifference where doctor was aware of the plaintiff's pain and mobility problems, but delayed referring plaintiff to an

orthopedist).

The record also supports the inference that Dr. Agler's purposeful delay of plaintiff's treatment continued for several months even after he admitted that plaintiff needed to see an orthopedist. Although Dr. Agler noted that plaintiff should see an orthopedic surgeon for his limited range of motion on January 26, 2012, (see Agler. Decl. ¶ 16), plaintiff did not have an appointment with Dr. Watkins until nearly three months later on April 16, 2012, (see id. ¶ 20). As Medical Director, Dr. Agler was responsible for directing general patient care for all inmates and "[making] sure [staff are] all on the same page when it comes to appropriate treatment and inappropriate treatment." (Tribble Decl. Ex. A at 27:5-10.) Therefore, it was Dr. Agler's responsibility as the person in charge to ensure that plaintiff's appointment was timely scheduled. Dr. Agler does not offer an explanation for the further delay. A reasonable jury could thus find that Dr. Agler purposely delayed plaintiff's treatment from October 7, 2011, until April 16, 2012, despite being aware that plaintiff's condition required the care of an outside consultant.[7]

2. Resulting Harm

It is not enough for plaintiff to point to a delay in his referral to Dr. Watkins: plaintiff must show that delay was harmful. See McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.

---

[7] Plaintiff complains of a number of delays in treatment for his finger. Because the evidence at least supports a finding that the September 2011 to April 2012 delay constituted deliberate indifference and caused harm, the court need not address the additional delays.

16

1992) ("[W]hen . . . a claim alleges 'mere delay of surgery,' a prisoner can make 'no claim for deliberate indifference unless the denial was harmful.") (quoting Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam)) (overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (1997)).

Although Dr. Watkins indicated at one point in his deposition that he was unable to address whether delays caused plaintiff harm, elsewhere he stated, "I'm sure [plaintiff] would have benefited by seeing a hand surgeon shortly after he had his accident or his altercation. He would have been more likely to have gotten better more quickly had he had prompt care and if he saw a hand surgeon six or ten months later." (Watkins Dep. at 50:21-51:4.) Further on, Watkins added, "I think that Mr. Wahl would have benefited by having reasonable care early, as soon as possible after the injury." (Id. at 52:11-13.) From those statements, a reasonable jury could find that plaintiff suffered harm as a result of the initial delay in his referral to a hand surgeon.

Because the record supports the inference that Dr. Agler deliberately and unnecessarily delayed plaintiff's referral to a hand surgeon despite being aware that plaintiff suffered from a degenerative disease, and that the delay caused harm, the court must deny defendant's motion for summary judgment with respect to plaintiff's Eighth Amendment claim against Dr. Agler. See Jett, 439 F.3d at 1096.

B. Monell Claim Against CCA

Plaintiff has also brought a Monell claim against CCA.[8] "An act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision-maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690-91 (1978)). Monell has been extended to operators of private entities such as prisons. See Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1138-39 (9th Cir. 2012) (holding that Monell liability applies to suits against private entities under § 1983).

To prevail on this theory, a plaintiff has "to prove 'the existence of a widespread practice that ... is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" Gillette v. Delmore, 979 F.2d 1342, 1348-1349 (9th Cir. 1992) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1989) (internal quotations omitted)). Plaintiff

---

[8] Although defendant did not raise the issue of state action, it is worth noting that the Supreme Court has not yet addressed whether private prison management companies are state actors for the purposes of § 1983. Several circuits have held that private prison management companies contracting with the state act under the color of state law. See, e.g. Rosborough v. Mgmt. and Training Corp., 350 F.3d 459, 461 (5th Cir. 2003) (holding private prison-management companies and their employees are subject to §1983 liability because they are performing a government function); Skelton v. Pri-Cor, Inc., 963 F.2d 100, 102 (6th Cir. 1991) (same); see also Hayes v. Corrs. Corp. of Am., Civ. No. 1:09-00122 BLW, 2012 WL 4481212, at *18 n.14 (D. Idaho Sept. 28, 2012) (recognizing that CCA is a state actor subject to suit under § 1983). Because the court has separate ground for granting summary judgment on the claim against CCA, it need not decide the issue of whether CCA acted under the color of state law in its alleged practice of delaying treatment.

18

must show the custom or practice was the "moving force" behind the constitutional violation. See Galen v. Cnty. of Los Angeles, 477 F.3d 652, 667 (9th Cir. 2007). Plaintiff argues that "Dr. Agler, as the medical director at the prison, was simply enforcing CCA's custom as it related to the scheduling of expensive offsite visits to private specialist such as Dr. Watkins." (Pl.'s Resp. at 10.)

Plaintiff's only evidence of a custom or practice are depositions and interrogatories produced during discovery in Caplinger, another case involving an inmate at ICC who also experienced delays in medical treatment. Caplinger alleged that there were consistent delays in his visits to Dr. Watkins despite his constant severe pain, broken bone, and torn ligaments, but he ultimately lost on motion for summary judgment. See Caplinger v. CCA, 999 F. Supp. 2d 1203, 1217-18 (D. Idaho 2014) (Winmill, J.) (holding the record did not support the inference that CCA had a custom of delaying appointments to outside providers). Even if there were also delays in Caplinger, taken together, two instances of delay is insufficient to establish a custom "with the force of law." See Gillette, 979 F.2d at 1348-49; Wilson v. Cook Cnty., 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident--or even three incidents--do not suffice."). Plaintiff points to no other evidence indicating that CCA had a widespread, settled custom of purposely delaying expensive offsite visits that was the "moving force" behind an Eighth Amendment violation. See Galen, 477 F.3d at 667; Gillette, 979

19

F.2d at 1349. Plaintiff has failed to present any evidence that CCA officials were aware that an informal custom of delays existed. See Gillette, 979 F.2d at 1349 (holding there was no Monell liability where the plaintiff failed to present evidence that City Manager and City Counsel helped formulate or were aware of an informal policy of disciplining public safety employees who were critical of operations). Plaintiff thus offers insufficient evidence of a policy or custom in connection with his alleged constitutional deprivations, so his Monell claim must fail. Accordingly, the court will grant defendants' motion with respect to the Monell claim against CCA.

IT IS THEREFORE ORDERED that defendants' motion to strike be, and the same hereby is, DENIED;

IT IS FURTHER ORDERED that defendants' motion for summary judgment be, and the same hereby is, DENIED in part, with respect to the claim against defendant Dr. Agler, and GRANTED in part, with respect to the claim against defendant CCA.

Dated: February 2, 2015

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE